UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

J.W.N. (XXX-XX-9795)                    CIVIL ACTION NO. 22-cv-3180

VERSUS                                  JUDGE TERRY A. DOUGHTY

COMMISSIONER OF SOCIAL SECURITY         MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

J.W.N. ("Plaintiff") filed an application for disability benefits that alleged disability beginning February 26, 2019. Plaintiff was born in 1965, so he was 53 at the time of his application. He earned a GED, and he has past work experience as a plant manager and an exterminator. His disability claim was based primarily on depression, post-traumatic stress disorder (PTSD), and similar mental limitations that began after Plaintiff found the body of his adult son who committed suicide. ALJ Charlotte Wright held an evidentiary hearing, at which Plaintiff was represented by counsel, and issued a written decision that found that Plaintiff was not disabled under the regulations. The Appeals Council denied a request for review, which made the ALJ's decision the Commissioner's final decision.

Plaintiff then filed this civil action to seek the limited judicial review that is available under 42 U.S.C. § 405(g). Plaintiff argues that the Commissioner's decision should be reversed because the ALJ's assessment of his residual functional capacity ("RFC") did not consider the fluctuations in Plaintiff's mental health. For the reasons that follow, it is recommended that the Commissioner's decision be affirmed.

**The Medical Evidence**

Plaintiff had an annual wellness visit in March 2019 and reported that his anxiety had progressively worsened over the holidays to the point that he rarely left the house, and he had not worked in two weeks. Plaintiff reported chest tightness when preparing for work and generally not wanting to be around people. He was drinking more and had lost interest in hunting. Plaintiff reported that a low dose of Buspar had helped some, so the dosage was increased, and the physician added Lexapro and Trazodone. Plaintiff stated that he was considering a therapist, and that was encouraged. Tr. 413-14.

A few weeks later, in May 2019, Plaintiff was evaluated by a psychiatric mental health nurse practitioner (PMHNP). He exhibited symptoms of anxiety, which he said had been present for the past six years and worsened when his son committed suicide three years earlier. Plaintiff reported experiencing panic attacks for years, and they involved the acute onset of intense fear or discomfort. Plaintiff reported symptoms including fatigue, isolation, difficulty sleeping, and increased drinking (12 beers daily). Aside from the recent problems, there was no history of psychiatric problems or treatment. The PMHNP noted that Lexapro was stopped because it was ineffective, and Trazodone was stopped because of a grogginess side effect. The PMHNP stated that Plaintiff presented as relaxed, attentive, communicative, and well-groomed. His speech was normal, and his language skills were intact. He denied hallucinations, delusions, or self-injurious ideas. There were no signs of anxiety apparent.

The PMHNP's diagnoses were major depressive disorder, recurrent severe without psychotic features; generalized anxiety disorder; and alcohol dependence. She wrote that

Plaintiff's emotional disorder adversely affected his relationships and interfered with day-to-day functioning that warranted medication management and continued treatment. She started Plaintiff on Seroquel to treat depression and continued the prescription for Buspar (anxiety). Tr. 439-42.

Plaintiff saw Dr. Ogundeji in August 2019. Plaintiff reported that his anxiety was "very bad" and that he could not get out of the house or really do anything. He was having crying spells. He was going to therapy but still struggling. Plaintiff was flushed and tearful during the interview and reported occasional suicidal thoughts along with episodes of trembling and shaking. He was still drinking, six to 12 beers a day, and he had nightmares about his son. The report stated that Plaintiff's "functioning at work is marginal," but there had "been no outbursts or expressions of anger." Plaintiff appeared anxious and sad in his interview, but he still had good cognitive functioning, insight, and judgment. The earlier diagnoses were repeated, together with PTSD. Dr. Ogundeji issued or renewed six prescriptions. Tr. 399-400.

Months later, in April 2020, Plaintiff saw Dr. Ogundeji again by telehealth video call. He reported two deaths in the family in the past month, his crying spells had reduced, and there were no nightmares, but he still had episodes on anxiety and low energy. He appeared glum, sad, and anxious in his interview. He still had good cognitive functioning, memory, and ability to handle abstract tasks. Tr. 449-50.

A telehealth visit in July 2020 found Plaintiff to be calm, attentive, and relaxed. His demeanor was sad, but there were no signs of anxiety. Plaintiff reported that his medications were working, and they were continued. Tr. 458-59. At a visit in August

2020, Plaintiff reported no significant changes, but he said that crying spells had worsened since a childhood friend died from complications of Covid.  Plaintiff was socializing less with family and friends, and some angry outbursts were occurring.  Tr. 460.

Plaintiff reported at a September 2020 visit that he believed Effexor was working. He denied crying spells, but he still had anxiety that worsened when he was driving.  He was still drinking but working on decreasing it.  There were no signs of anxiety, and his mood was normal with no signs of depression.  Tr. 462.

Plaintiff started weekly hypnotherapy sessions in October 2020.  The following month, Plaintiff reported that he was continuing to feel better mentally and emotionally, and he found himself looking forward to activities such as hunting and attending church. He said the hypnotherapy was "definitely helping" with his issues.  Other reports from the hypnotherapist were generally good, although Plaintiff had some sadness around the holidays associated with the past loss of loved ones, and he expressed some anxiety about his disability hearing.  In January 2021 he was feeling down near the anniversaries of the death of his brother and mother-in-law.  The hypnotherapist noted that Plaintiff appeared to have a co-dependency on his wife, as he had anxiety at the thought of leaving her at home alone.  Tr. 473-78.

The ALJ also received a report from George Lazar, Ph.D., whom the agency hired as an independent medical examiner.  Dr. Lazar reviewed the records but did not examine Plaintiff.  He found that Plaintiff suffered from anxiety and major depressive disorder.  He found that Plaintiff could perform one-two-three step tasks, and his interactions with the public, coworkers, and supervisors should be limited to occasional.  The only areas of

functioning in which Dr. Lazar found marked limitations were interacting with others and the ability to understand, carry out, and make judgments on complex matters.  He found only mild or moderate limitations in areas such as understanding, concentrating, and managing oneself.  Tr. 485-501.  The ALJ found that Dr. Lazar's assessment was "partially persuasive" in determining the RFC, to the extent that his "marked" limitations meant that Plaintiff could perform simple tasks with occasional interactions with others.  The ALJ cited specific medical records in support of that assessment.  Tr. 22.

Dr. Ogundeji completed a mental capacity assessment form on which he checked boxes to indicate marked limitations in the ability to work at a consistent pace, work close to or with others, and work a full day without needing more than the allotted rest periods.  He also found marked limitations in the ability to adapt to changes, manage psychologically based symptoms, and set realistic goals.  The same was true for the ability to handle conflicts with others and keep social interactions free of excessive irritability or argumentativeness.  He found only mild or moderate limitations in other areas such as the ability to sequence multi-step activities, ignore distractions, and sustain regular attendance.  Tr. 405-07.

The ALJ found that Dr. Ogundeji's assessments "were not persuasive" in determining the restrictions in the RFC.  The ALJ wrote that Plaintiff had maintained intact thought process, memory function, and cognitive abilities throughout the disability period, which indicated that he had no limitation completing one or two-step instructions and tasks.  He could also perform simple job tasks and make simple work-related decisions.  The ALJ discounted Dr. Ogundeji's finding that Plaintiff had a marked limitation with keeping his

social interactions free of excessive irritability and handling conflicts with others, noting that there was only one example of Plaintiff noting anger outbursts with others, and there were no other examples of aggressiveness with others throughout the period.  Tr. 23.

Dr. Tynes, Plaintiff's internal medicine physician, also completed a mental capacity assessment form.  He indicated marked limitations in the ability to work at appropriate pace, work closely with others, and work a full day without needing more than the allotted breaks.  He also found marked limitations in the ability to adapt to changes and manage psychologically based symptoms, as well as handle conflicts with others and keep social interactions free of excessive irritability or argumentativeness.  Tr. 393-95.  The ALJ discounted this assessment because the findings were "not supported" and, like Dr. Ogundeji, Tynes had assigned marked limitations in areas where the evidence of record did not support such a degree of limitation.  Tr. 23.

The ALJ also looked to findings of state psychological consultants who reviewed the records and opined that Plaintiff could accept simple directions and cope with the demands of a standardized work environment with minimal variation.  She found those assessments persuasive in that they suggested Plaintiff could complete simple job tasks and make simple work-related decisions.  She stated that consideration was given to Plaintiff's social anxiety by limiting his interactions with others to no more than occasionally.  Tr. 23. In social security cases, "occasionally" means occurring from very little up to one-third of an 8-hour workday.  SSR 83-10; Elizondo v. Kijakazi, 2023 WL 3214598, *7 (W.D. Tex. 2023) (citing POMS DI 25001.001 ¶ 53).

**Hearing Testimony (Tr. 54-72)**

Plaintiff testified that he sees an internal medicine doctor annually and goes to a psychiatrist.  He also sees counselors and a hypnotherapist.  Plaintiff said that he never took medications until recent years, and the ones he takes make him very dizzy so that he cannot drive.  He said that he has a driver's license and does drive two or three times a month, but his wife usually drives.  Plaintiff had not been hospitalized or visited the ER recently.

The ALJ asked about the indications of alcohol abuse in the medical records.  Plaintiff said that he drinks beer, and his doctor told him that he was self-medicating.  The doctor recommended a medication to help stop drinking, but Plaintiff said that he could not afford the $100 a month cost.

The ALJ asked Plaintiff about his memory and ability to pay attention, concentrate, or focus.  Plaintiff said that he had problems in those areas "sometimes, not all the time." He denied problems understanding information and instructions, but he said his wife "makes all the decisions."  He said that one of his biggest problems is anxiety when he goes out in public.  Plaintiff said that, within a four-year period, he lost his son, brother, brother-in-law, and a friend.  His mother is suffering from Alzheimer's, and his wife had been hospitalized.

Plaintiff testified that he was able to cook a little, sometimes did the dishes, and perhaps monthly participated in sweeping, mopping, and similar chores.  He does the yardwork.  He used to go hunting for a full weekend at a time, but recently he had been

only twice.  He has no other hobbies, but he is able to care for two Australian Shepherds and five puppies.

A vocational expert ("VE") testified at the hearing.  The ALJ asked her to assume a hypothetical person of Plaintiff's age and education with his past work experience as a plant manager (over nine employees) and exterminator.  Further, the VE was to assume that the person could perform work at all exertion levels but with non-exertional limitations that limited them to the performance of simple, routine tasks; simple work-related decision making; and only occasional interaction with supervisors, coworkers, and the public.  The VE testified that the person would not be able to perform Plaintiff's past jobs, but they could perform the demands of other jobs including janitor, floor waxer, and price marker.  The VE referred to descriptions of those jobs in the Dictionary of Occupational Titles.

**Standard of Review; Substantial Evidence**

The court reviews the Commissioner's denial of benefits "only to ascertain whether (1) the final decision is supported by substantial evidence, and (2) whether the Commissioner used the proper legal standards to evaluate the evidence."  Whitehead v. Colvin, 820 F.3d 776, 779 (5th Cir. 2016).  "Substantial evidence is more than a scintilla and less than a preponderance."  Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."  Boyd v. Apfel, 239 F.3d 698, 704 (5th Cir. 2001).

**Analysis**

Plaintiff argues that the Commissioner's decision should be reversed and remanded because "the ALJ erred in her consideration of the fluctuation in Plaintiff's conditions and Plaintiff's separation anxiety." For some context, it is helpful to review the ALJ's five-step analysis that is required by the regulations. She found that Plaintiff had not been working (step one) and suffered from severe impairments (step two) in the form of generalized anxiety disorder, major depressive disorder, PTSD, and alcohol abuse disorder. The limitations were not so severe as to meet or equal the severity of one of the listed impairments in the regulations that would require a step three finding of disability without further assessment.

Before going to step four, the ALJ must assesses the claimant's RFC by determining the most the claimant can still do despite his or her limitations. 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1). The claimant's RFC is used at steps four and five to determine if the claimant can still do past relevant work or adjust to other jobs that exist in the national economy. 20 C.F.R. § 404.1520(e), 404.1545(a)(5).

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can perform simple tasks in a routine work setting. He can make simple work-related decisions, and he can have no more than occasional interaction with coworkers, supervisors, and the public.

The ALJ found at step four, based on VE testimony, that Plaintiff's RFC did not permit him to perform the mental demands of his past jobs as plant manager or exterminator. She then found at step five, again based on VE testimony, that Plaintiff could

perform the demands of other jobs such as a janitor, floor waxer, and price marker. That directed a finding of not disabled under the regulations.

Plaintiff argues that the ALJ should have specifically considered fluctuations in his conditions and, particularly, his separation anxiety. He notes that the record showed variations in the degree of anxiety or other symptoms that he experienced or claimed during various visits. Some of the medical records indicate signs of improvement, while others note a setback.

Plaintiff's argument invokes <u>Singletary v. Bowen</u>, 798 F.2d 818 (5th Cir.1986), which interpreted disability under the Act to apply to cases in which a person is capable of working for short periods but cannot *maintain* a job because his impairment flares up too often. <u>Singletary</u> does not, however, require every decision by an ALJ include a separate finding regarding the claimant's ability to maintain a job or the fluctuation of his symptoms. <u>Frank v. Barnhart</u>, 326 F.3d 618, 621 (5th Cir. 2003).

An ALJ's finding that a claimant can perform a certain level of work necessarily includes a finding that he is able to perform at that level not just intermittently but eight hours a day, five days a week. A separate and express finding regarding maintaining work is required only when the claimant's ailment "waxes and wanes in its manifestation of disabling symptoms," such as a person whose "degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs." <u>Frank</u>, 326 F.3d at 619. <u>See</u> <u>also</u> <u>Dunbar v. Barnhart</u>, 330 F.3d 670 (5th Cir. 2003) and <u>Hollinger v. Kijakazi</u>, 2021 WL 3775376 (5th Cir. 2021) (claimant with mental

limitations that were of a stable nature for years did not require a separate finding under Singletary).

Plaintiff, like almost every person with a medical condition, experienced various degrees of severity in his symptoms over the applicable years. There was not, however, an indication that Plaintiff experienced significant periods of time where he had an ability to perform work at the designated RFC level, followed by flare-ups that diminished his RFC to the point that he could not maintain such a job. Rather, his anxiety, depression, PTSD, and other problems caused generally constant limitations with only small, ordinary variations in severity. Under these circumstances, the ALJ was not required to make a separate finding or engage in a separate discussion of the fluctuation of Plaintiff's conditions or his ability to maintain a job.

Accordingly,

It is recommended that the Commissioner's decision be affirmed.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 29th day of August, 2023.

Mark L. Hornsby
U.S. Magistrate Judge